**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 9-16-
2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  12-CR-130-01-SM
            v.                  *  June 12, 2013
                                *  2:15 p.m.
    FREDERICK MCMENIMEN         *
                                *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF COMPETENCY HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


APPEARANCES:


For the Government:    William Morse, AUSA
                       U.S. Attorney's Office




For the Defendant:     Bjorn Lange, Esq.
                       Federal Defenders Office




Court Reporter:        Susan M. Bateman, LCR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH 03301
                       (603) 225-1453

1                 P R O C E E D I N G S

2            THE CLERK:  Court is in session and has for

3  consideration a competency hearing, part two, in the

4  United States of America versus Frederick McMenimen,

5  criminal case number 12-CR-130-1-SM.

6            THE COURT:  Mr. Lange, did you want to take a

7  matter up at sidebar?

8            MR. LANGE:  I do.

9            (SIDEBAR)

10            MR. LANGE:  My client was here around the

11  courthouse at about a quarter or ten of 2:00.  He saw

12  a cameraman out front.  There's a cameraman out there

13  now.

14            He refuses to come to the front door.  I had

15  long conversations with him.

16            I just went and spoke to Deputy Marshal Gene

17  Robinson and asked if he could come to the back door,

18  and they won't do it.  That's where it's at.

19            THE COURT:  Why won't they?

20            MR. LANGE:  I don't know.  I think they don't

21  want to set a precedent.

22            THE COURT:  We can break precedence.

23            MR. LANGE:  Yes, we can.

24            THE COURT:  Okay.  Where is he?

25            MR. LANGE:  He's with his stepfather probably

1  about a block away.

2        THE COURT:  Do you have a problem with that?

3        MR. MORSE:  No, I don't have a problem with

4  it.

5        THE COURT:  We've done that with other

6  defendants I think.

7        MR. MORSE:  Not with -- which case?

8        MR. LANGE:  The Rwanda case.  They did it

9  with the witnesses in the Rwanda case.

10        MR. MORSE:  I'm not familiar with the

11  procedure, but I have no objection.

12        THE COURT:  Okay.

13  (Court Security Officer is asked to approach sidebar)

14        THE COURT:  Could you arrange to have the

15  marshal bring the defendant into the courthouse

16  through the garage or something, through the sally

17  port or whatever?

18        COURT SECURITY OFFICER:  Okay.

19        THE COURT:  Mr. Lange can go with you -- or

20  go with the marshal.  You know where he is, right?

21        MR. LANGE:  Yes, I do.

22        THE COURT:  Okay.  So ten minutes?

23        MR. LANGE:  Okay.

24        THE COURT:  Just give me a call.

25        (CONCLUSION OF SIDEBAR)

1          (RECESS)

2          THE CLERK:  The Court is in session.

3          THE COURT:  All right.  Mr. Lange, I've seen

4    Dr. Drukteinis' letter.  I'm not sure what it adds.

5          MR. LANGE:  Your Honor, can we clear the

6    courtroom except for the case agent?

7          THE COURT:  Why?

8          MR. LANGE:  Because this has to do with his

9    medical situation.

10         THE COURT:  I'm not sure that's grounds for

11   sealing the courtroom, is it?  It's a public hearing.

12         MR. LANGE:  Well, that constrains what I'd

13   say.  I'll keep my arguments more general then.  I

14   don't want the details of his condition to be out

15   there in the public domain.

16         THE COURT:  What do you think, Mr. Morse?

17         MR. MORSE:  Your Honor, I don't know what the

18   law is on sealing this proceeding.  I certainly think

19   that at a minimum the victims in the case should be

20   allowed to know about what was delaying the process of

21   the case, and at the end of this hearing I was going

22   to ask -- if it had been sealed, I was going to at

23   least ask that it be unsealed for that purpose, to

24   disclose to them.  But I'm not sure there's any legal

25   basis for sealing the proceeding in the first

1   instance.

2        MR. LANGE:  Your Honor, we don't object to

3   the latter statements, the victims being allowed to

4   remain.  Members of the public, we do ask that they be

5   excused.

6        THE COURT:  Well, I can't do that.  I mean,

7   the victims are members of the public.  There's no

8   special status there.  It's a public proceeding.  It's

9   open to the public.  The public has to know what we're

10  doing and whether we're doing things properly or

11  correctly or at least have a basis for saying we

12  aren't.

13       I really don't see it.  I understand there

14  are sensitive issues, but on the other hand I really

15  don't see a basis for sealing the proceeding.

16       So I guess your request is denied.  If

17  there's something particularly sensitive, you can

18  certainly approach the sidebar and we'll take it up

19  that way, but I'm not going to seal the proceeding.

20       MR. LANGE:  That's the way I'll do it.

21       THE COURT:  All right.  So I've read his

22  report.  Where are we?  What's the status, I guess?

23       MR. LANGE:  Your Honor, I think the

24  determinations that were made and that are summarized

25  in the earlier report dated April 11th indicates that

1   essentially my client's condition is maybe somewhat

2   better but that he is still not competent to stand

3   trial at this time.

4          THE COURT:  Well, I haven't made a finding

5   about that yet, and frankly, I think Dr. Drukteinis --

6   at some point I suppose we're going to have to go into

7   it in greater detail.

8          My understanding is that the way we left it

9   was he's willing to go through a private treatment

10  regiment while on bail.  Dr. Drukteinis thought that

11  might prove effective in the short-term.  Why wouldn't

12  you?  We would grant a continuance normally for

13  convenience of counsel certainly, and we would

14  certainly grant continuances related to all types of

15  processes that might be ongoing.  It's not really

16  infringing upon his speedy trial right at this point

17  or the public's right to a speedy trial.  Why wouldn't

18  you let him give it a shot with doctors that he

19  prefers and circumstances that he prefers?

20          I read this report as saying, well, it's not

21  going so great, but on the other hand maybe in a few

22  more weeks, who knows.

23          I know you understand this, and I suppose

24  your client should understand it.  The real answer is

25  that if he's not competent to stand trial he's to be

1   committed to the custody of the attorney general, and

2   the attorney general will put him in a place of

3   suitable treatment and try to fix him.  We're sort of

4   putting that off, and I'm not sure there's much reason

5   to put that off anymore.  If you stand there and tell

6   me, well, Dr. Drukteinis says he's not competent to

7   stand trial, well, okay.  The statute is very clear

8   about what the process is.

9           MR. LANGE:  He has engaged in treatment.  As

10  recently as yesterday he got his medication, and I'll

11  put that on the record at sidebar if you think it's

12  necessary.  He's doing what he can to address the

13  problem that he recognizes that he has.

14          THE COURT:  But I'm sure you don't disagree.

15  We have a statute that tells us what to do in this

16  circumstance.

17          MR. LANGE:  I know what the statute says,

18  your Honor.

19          THE COURT:  Okay.  So why aren't we doing

20  that, I guess?  Why wouldn't we do that?

21          MR. LANGE:  Because I think in the long run

22  it's going to delay the case even more.

23          THE COURT:  I don't care about the delay.

24  Who cares about the delay.  If the delay is for the

25  right reason, it's the right reason.  It's not an

1   issue.  It's not a rush to judgment.  It's a question

2   of handling it properly.  I mean, you know what the

3   issue is.

4            MR. LANGE:  I do.

5            THE COURT:  Okay.  You know this can't go on

6   forever.

7            MR. LANGE:  I understand that.

8            THE COURT:  And it can't be a minuet in which

9   December rolls around, still depressed.  February

10  rolls around, still depressed.  We can't do it that

11  way.

12           MR. LANGE:  Well, your Honor, he's on

13  medication and it's a treatable condition.  I've got

14  the medication on a list here, and it's consistent

15  with what Dr. Drukteinis recommended.

16           THE COURT:  Well, I guess the question is, is

17  he competent to stand trial?  Is he -- and your

18  position is, I guess, he's not.

19           MR. LANGE:  I have major questions, and I'm

20  satisfied that the evaluation from April 11th

21  addresses it.

22           THE COURT:  I think it does.  And Dr.

23  Drukteinis -- you know, I took from his testimony he

24  has some reservations as well, but that's the

25  diagnosis he has given.

1          All right.  Mr. Morse, what do you think?

2          MR. MORSE:  Your Honor, I would object to

3   continuing to proceed with a self-restoration process.

4   I think there are a number of problems that become

5   apparent just from the issuance of the second report

6   that was issued last week.  The process isn't really

7   adequately vindicating the government's compelling

8   interest in seeing the prosecution -- pursuing the

9   prosecution of someone who has been indicted by a

10  grand jury for some serious crimes.

11         Specifically, the letter from Dr. Drukteinis

12  appears to be based solely on information that Dr.

13  Drukteinis obtained from the defendant.  There's no

14  indication that Dr. Drukteinis has read any of the

15  treatment notes that were taken by whoever it is who

16  was treating the defendant.  I honestly don't even

17  know who that is at this point.

18         THE COURT:  But I'm not sure what your point

19  is.  As I read this report, it says nothing has

20  changed.

21         MR. MORSE:  Yes.

22         THE COURT:  Therefore, my prior report

23  stands?  My prior report is he is not competent in

24  that he cannot adequately assist his counsel in

25  providing a defense for him.

1          MR. MORSE:  Right.  But I think our object at

2     the last hearing was to get him treated to a point

3     where he would be competent and be able to stand

4     trial.

5          THE COURT:  Uh-huh.  Well, at least to see.

6          MR. MORSE:  Yeah.

7          THE COURT:  Give him a shot.

8          MR. MORSE:  There's a lot of questions that

9     Dr. Drukteinis' report begs to have answered.  I mean,

10    we have no information about what the treating

11    psychiatrist has even been told about the defendant's

12    condition to confirm that the defendant is receiving

13    appropriate treatment.

14          We have no information other than the

15    defendant's own statements as to the degree to which

16    he is complying with any regiment of medication or

17    counseling that the treating physician has ordered.

18          We have no information about the period

19    during which the defendant was on the first medication

20    that he was taken off of because of unspecified side

21    effects.

22          We don't know whether those side effects were

23    objectively discernible or simply subjective vague

24    complaints by the defendant.  So it's hard to tell if

25    the problem with the medicine was real or a

1   fabrication or an exaggeration by a malingering

2   defendant.

3          We have no information on the identity of the

4   drug prescribed to replace the original drug, and we

5   have no information as to whether the defendant sought

6   to treat these side effects.

7          THE COURT:  I know you're making a point

8   different from the one I addressed, but I'm not quite

9   sure what it is.

10          MR. MORSE:  My point is --

11          THE COURT:  Your point is this is an

12   inadequate process.

13          MR. MORSE:  Yes, your Honor.  It's also

14   inadequate because -- or at least relative to what the

15   statute seems to contemplate -- or does contemplate.

16   It's a 24/7 observation for an extended period of

17   time.  It is generally much more accurate in assessing

18   the defendant's progress rather than periodic visits

19   with Dr. Drukteinis which have lasted at the most an

20   hour or two each.

21          The Bureau of Prisons' psychiatrists are

22   highly experienced in restoring competency, and the

23   administration of medications and psychotherapy can be

24   more closely monitored.  And that's an important

25   point, your Honor, in light of the defendant's history

1  of self-neglect.  He's been prescribed medications and

2  counseling on multiple occasions that he hasn't

3  followed through with.

4        It's also odd, your Honor, I think Dr. -- I'm

5  pretty certain Dr. Drukteinis' testimony was that the

6  defendant need -- if he was going to have outpatient

7  treatment, it would be an intensive regiment of

8  outpatient treatment that would involve very difficult

9  interviews or counseling sessions two or three times a

10 week.  According to Dr. Drukteinis' letter from June

11 4th, the defendant was only seeing his psychiatrist

12 one day a week.  So we have no explanation as to why

13 the defendant is not receiving the treatment that even

14 Dr. Drukteinis said would be necessary to restore his

15 competence.

16       In addition, your Honor, there are other

17 collateral consequences that stem from being found to

18 be incompetent to stand trial.  For example, there is

19 a restriction on possessing a firearm for persons who

20 are found to be incompetent to stand trial.  That

21 consequence has --

22       THE COURT:  Is that not a condition of his

23 release?

24       MR. MORSE:  It's a condition of his release,

25 but there's a separate statute that makes it

1  a separate crime.  Congress has determined that it's a

2  separate crime for someone adjudged incompetent to

3  possess a firearm.

4          I understand that he would also be in

5  violation of his term of bail, but this would make it

6  a separate crime if he is in fact incompetent.  And

7  the choice to pursue the self-restoration process as

8  opposed to making a finding of incompetency and --

9          THE COURT:  Well, you know, I think we ought

10  to be clear.  We're probably getting a little ahead of

11  ourselves.  It's not necessarily a self-restoration

12  process.  Again, I was explicit in avoiding making the

13  finding, so there is no finding of incompetence.

14          MR. MORSE:  I think that's sort of my point,

15  that because of that he is allowed by law -- although

16  not by the terms of his bail, but by law -- to possess

17  a firearm.

18          There are reporting requirements for persons

19  who are found to be incompetent so that people who

20  sell firearms can make sure they're not selling

21  firearms to incompetents.  That provision has also not

22  been triggered.  In other words, the defendant could

23  walk into a firearms shop and purchase a firearm

24  without anyone knowing anything about his mental

25  condition.

1           I think most importantly, your Honor, the

2   defendant doesn't appear to be making progress.  We're

3   basically right where we were when we started.  Even

4   if you take everything that's in Dr. Drukteinis'

5   report -- which again was derived from the defendant's

6   statements -- at face value, he's not on any

7   substantial -- he has not been on any sustained

8   prescription medication program.  He is not receiving

9   the intensive counseling that Dr. Drukteinis said

10  would be necessary to restore his competence and to

11  treat him effectively, and as a result it's not

12  surprising that we haven't seen much improvement in

13  the defendant's condition.

14          So for those reasons, your Honor --

15          THE COURT:  It's your burden to establish his

16  competence, correct?

17          MR. MORSE:  I'm not sure what the law is on

18  who -- I think in the First Circuit it hasn't been

19  decided whose burden it is.  But in this case I would

20  say that that's not material, because regardless of

21  whose burden it is the uncontroverted evidence that

22  that was adduced at the hearing, the last hearing, is

23  sufficient to show by a preponderance of the evidence

24  that the defendant is not competent to stand trial.

25          THE COURT:  All right.  Well, I guess that

1    was really my point.  You don't dispute that?  You

2    don't dispute that?

3              MR. MORSE:  No.

4              THE COURT:  The government accepts that he's

5    not competent to stand trial at this point?

6              MR. MORSE:  That's correct, your Honor.

7              THE COURT:  Based on Dr. Drukteinis'

8    evaluation?

9              MR. MORSE:  Based upon Dr. Drukteinis'

10   evaluation, the observations by Attorney Lange which

11   set this whole process in motion, discussions with

12   witnesses who reported to the government certain

13   aspects of the defendant's behavior, and other

14   evidence.

15             THE COURT:  All right.  Anything else, Mr.

16   Lange?

17             MR. LANGE:  Yes, your Honor.  I think the

18   defendant has made real progress.  We were in front of

19   you on May 7th.  At that point he was not taking any

20   kind of medication and he was not currently engaged.

21   He has been engaged since then for treatment down at

22   Mass General.

23             The medication has been prescribed, and he is

24   taking it.  I've got the label that came off the

25   prescription bottle.  I think one of the issues here

1  is to get him stabilized on medication so that he can

2  engage in more talk kind of therapy right now.

3          THE COURT:  I appreciate your position.  I

4  really do, but there's -- you know, I think I've bent

5  over backwards as far as I can, and honestly I tend to

6  agree with Mr. Morse.  I expected to see a little bit

7  more -- a little bit more by way of, here's what I'm

8  engaged in, here's the prognosis, here's the follow-up

9  diagnosis.

10          Dr. Drukteinis' letter, frankly, adds nothing

11  other than to say nothing has changed.

12          MR. LANGE:  That's not completely true, your

13  Honor.  It indicates that Mr. McMenimen indicated for

14  the first time that he needed to have a clear mind.

15          THE COURT:  Oh, sure.  Yeah.  I mean,

16  signposts.  Mr. McMenimen appears to be about the same

17  and there's nothing -- what's he doing?  I don't know.

18  How likely is that to be effective?  I don't know.

19  What has his current treating psychiatrist said?  I

20  don't know.  What can I expect in the next 90 days?  I

21  don't know.

22          MR. LANGE:  The current psychiatrist

23  indicates that he's to get the medication stabilized

24  and get something that gets him sufficiently composed

25  so that he can then engage in more intensive

1    psychotherapy.

2              THE COURT:  Sure.  Two days a week, is that

3    likely to be effective?

4              MR. LANGE:  I understand --

5              THE COURT:  You see the problem.

6              MR. LANGE:  I understand that he's going

7    three days a week is my understanding.

8              THE COURT:  Again, the statute is pretty

9    clear, and I agree with Mr. Morse.  It was a nice try,

10   but it's not really working out well.

11             MR. LANGE:  What we would propose is that the

12   Court set a date for September.

13             THE COURT:  I'm sorry?

14             MR. LANGE:  The current trial date is July.

15             THE COURT:  Oh, there won't be a trial.  He's

16   not competent to stand trial.  We cannot try somebody

17   who is not competent to stand trial.  So there's no

18   trial.

19             All right.  I find based upon Dr. Drukteinis'

20   testimony and his report, having considered the

21   supplemental report as well, and argument of counsel,

22   I find that the defendant is incompetent -- or there's

23   reasonable cause to believe that the defendant is

24   presently suffering from a mental disease or a defect

25   rendering him mentally incompetent to the extent that

1  he is unable to assist properly in his defense for the

2  reasons set forth by Dr. Drukteinis.

3          Having made that finding under 18 U.S. Code,

4  Section 4241(a) and (d), the defendant is necessarily

5  committed to the custody of the attorney general who

6  shall hospitalize the defendant for treatment as

7  provided for in 18 U.S. Code, Section 4241(d).

8          Hopefully Mr. McMenimen will be restored to

9  competence in a timely fashion, if that's possible, in

10  which case we'll resume the proceeding.  And if he's

11  not, then we'll determine what a reasonable period

12  might look like in terms of restoring him to

13  competence.

14          All right.  Anything else?  All right.  Court

15  is adjourned.  The defendant is remanded to the

16  custody of the marshal.

17          (Conclusion of hearing at 2:55 p.m.)

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8

 9
     Submitted: 6-18-13
10
                              SUSAN M. BATEMAN, LCR, RPR, CRR
11                            LICENSED COURT REPORTER, NO. 34
                              STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```