ATTACHMENT 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 12-CR-00130-SM |
| FREDERICK V. MCMENIMEN, III, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S MOTION *IN* LIMINE NO. 1 FOR AN ORDER PRECLUDING UNAUTHENTICATED FORGERIES AND FABRICATIONS AND HEARSAY

The United States of America, by John P. Kacavas, United States Attorney for the District of New Hampshire, hereby submits this Memorandum of Law in Support of the Government's Motion in Limine No. 1 for an Order Precluding Unauthenticated Forgeries and Fabrications and Hearsay. The evidence the government seeks to preclude is a series of six unauthenticated documents purporting to memorialize agreements and dealings between the defendant and clients of the defendant's financial advisory business who were victimized by the scheme described in the Grand Jury's indictment. The subject documents are attached to the government's motion as Attachment 1.A. through 1.F.

The subject documents should be precluded because the defendant has not and cannot carry his burden of establishing their authenticity. In fact, the documents were by all appearances forged and fabricated by the defendant – *a proven, inveterate document counterfeiter* -- in anticipation of the allegations in the Grand Jury's indictment. Moreover, to the extent the subject documents contain gratuitous, self-serving statements

about the history of the dealings between the defendant and the victim clients and handwritten notes that are not demonstrably part of the purported agreements, they are also inadmissible hearsay that should be excluded.

The government requests an evidentiary hearing on this motion.  At that hearing, the defendant should be required to present any authentication and foundational evidence in support of the admissibility of the subject documents that he wants the Court to consider.  The government will be prepared to present evidence in support of preclusion. The government also requests a ruling on this motion sufficiently in advance of trial, set for jury selection on March 18, 2014, to allow the parties to conform their respective trial presentations to the Court's ruling.

## I.    FACTS [1]

### A. Background

The defendant, a former retail investment broker with the Prudential Securities brokerage firm, has been charged in an Indictment with multiple counts of Wire Fraud, Interstate Transportation of Stolen Property, Money Laundering and Federal Income Tax Evasion.  The charges in the indictment stem from the defendant's theft of more than $1 million from several of his long-term elderly, female financial advisory clients.  Those clients were widowed, unsophisticated investors who, after the death or their respective husband, each relied principally if not exclusively upon the defendant to manage their financial matters appropriately.

---

[1]     The facts recounted herein are derived principally from either documents that already are part of the record or from reports and other documents in the investigative file.  The government proffers this information for purposes of this written motion but is prepared to introduce it at an evidentiary hearing to the extent required.

In general, the victim clients allege that the defendant falsely induced them to make payments – amounting to the bulk of their life savings -- to the defendant by misrepresenting and disguising them as payments for purchases of new investment instruments.  The victim clients made the disputed payments by liquidating existing investments and, at the defendant's instruction, writing checks payable to "PSB," which could easily be mistaken as an abbreviation for Prudential Securities Brokerage or some other entity related to Prudential Securities.  The defendant then deposited the checks in a previously dormant, out-of-state bank account maintained in the name "PSB Sports," a defunct retail sporting goods business the defendant once owned and operated.

The defendant periodically withdrew funds from the PSB Sports account.  He used the proceeds of those withdrawals to purchase cashier's checks, which the defendant then deposited in an account at another bank in the name of his father.  The defendant's father provided the defendant with pre-signed, but otherwise blank, checks that the defendant then used to draw and to convert to his own personal benefit the funds deposited to his father's account.

On November 7, 2011, law enforcement officers confronted the defendant with the substance of the charges in a pre-indictment, investigative interview.  In response, the defendant claimed that at least one of the victim clients made the payments at issue, not because the defendant fraudulently induced her to make the payments, but because she owed the defendant money for services he previously had provided to her.  The defendant maintained that his attorney had prepared a document explaining the legitimate basis for the transactions.  The defendant also claimed that he once had records supporting his

claim but he had disposed of them just three weeks earlier (approximately October 15, 2011) when he cleaned out a storage unit in which he had been keeping them.

### B. **The Anticipated Defense**

In his pre-trial pleadings, the defendant has indicated that he intends to rebut the charges in the indictment with evidence that he did not fraudulently induce the payments from his victim clients and that the payments instead constituted "delayed compensation for services he rendered to them and to their families in planning and administering their estates," which, according to the defendant, each of the victim clients had authorized. See Defendant's Motion for Pre-Trial Subpoenas Duces Tecum, Doc. No. 49, p. 3. Whether the jury accepts or rejects that defense will likely determine its verdict on the Mail Fraud, Interstate Transportation of Stolen Property and Money Laundering charges. The Tax Evasion charges will be largely unaffected by the success or failure of the defendant's anticipated defense.

### C. **The Subject Documents**

During the investigation that ultimately led to the Indictment, the Grand Jury issued subpoenas to, among others, two entities:  (A) PSB Sports, L.L.C.; and (B) Custom Financial L.L.C., an investment advisory business the defendant owned and operated before joining Prudential Securities in 2007.  The subpoenas required the production simply of the following:

> FOR THE YEARS: September 1, 2008 through November 30, 2011

> All documents reflecting the reasons for any payments from
> [certain named individuals, including the victim clients,] to
> PSB Sports, L.L.C.

In response to the subpoenas, the two entities produced, among other documents, one set of the subject documents, with a transmittal letter from the defendant's attorney in this criminal case. In general, the subject documents comprise a series of purported written agreements in which victim clients supposedly agreed to pay to the defendant substantial portions of their estates in exchange for financial and estate planning work the defendant purportedly performed as long ago as 1997. According to the subject documents, the defendant agreed to allow his victim clients to delay the payment of the money they owed him for twelve years or more. Also, the documents are dated on various days between September 13, 2003, and August 14, 2011, just two months before the date on which the defendant told investigators he had disposed of the documents from the storage unit. The subject documents include signatures purporting to belong to the defendant and his victim clients.

The vast majority of the subject documents' text is typewritten or computer printed, but there are also numerous hand-written edits, margin annotations and apparent references to other documents not produced (e.g., "SEE 2011 & 2010 ADDENDUM," "owes more, recalculate," "Need to fix," "Redo," and "To be modified in August, use for now."). The meaning and significance of those hand-written notes and the circumstances under which they were applied to the documents is a mystery. Nor is it known whether the handwriting was placed on the document before or after the purported signatures.

## D. **The Certificates of Authenticity**

Accompanying the subject documents were Certificates of Authenticity from both PSB Sports L.L.C. and Custom Financial, Inc. The Certificates of Authenticity (prepared using forms the government routinely provide subpoena recipients for that purpose) state that the defendant is a custodian of each of the subpoenaed entities. The Certificates of Authenticity further state that the subject documents were original records or true copies thereof in the custody of each entity and that the defendant is the custodian of the subject documents. Although both PSB Sports and Custom Financial were essentially one man shops run by the defendant that had been out of business long before some of the subject documents were even created, the Certificates of Authenticity also state the following:

A. all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by, or from information transmitted by, a person with knowledge of those matters;

B. such records were kept in the course of the a regularly conducted business activity [the respective entity];  and

C. such records were made by [the respective entity] as a regular practice.

Each Certificate of Authenticity states that the certification "is intended to satisfy Rule 902(11) of the Federal Rules of Evidence." Finally, each of the Certificates of Authenticity – filed herewith as Exhibits 1.A and 1.B -- was signed by the defendant.

## E. **The "Originals"**

None of the documents initially produced by PSB Sports or Custom Financial appeared to be originals. In the exercise of an appropriate degree of professional skepticism and based upon the many of the facts recounted in this memorandum, the

government wrote to counsel for the defendant seeking the production of the original versions of the documents.  In response, the defendant's counsel sent a letter stating: "[H]ere are all the originals and copies in my possession of the documents that we delivered to your office."  This production included the same documents the two entities originally produced, though this production included multiple versions of some of the documents.  Also on some of the documents, the defendant's signature appeared in blue ink.  The signatures of the defendant's victim clients, even in this second production, invariably appeared in black, perhaps copier, ink.  It is impossible for a layperson to determine which if any of the documents included in this production is an original.

The transmittal letter from the defendant's counsel that accompanied the second production also stated that the "documents were in files Frederick McMenimen's former counsel delivered to [him that] had Post-Its indicating that former counsel received them on November 10, 2011."  In other words, according to the defendant's counsel, the defendant supplied the subject documents to his former attorney three days after the defendant told investigators that documents supporting his claimed defense had been disposed of in his storage room clean out.

## F.  The Victims' Take on the Subject Documents

When shown the subject documents, two victim clients generally stated that the documents are fakes, created by the defendant to try create the appearance that the payments the defendant fraudulently induced them to make were, instead, legitimate. Although they acknowledge that, in some cases, the purported signatures on the subject documents look like their signatures, they deny that they applied or authorized the

application of their signatures to the documents.  Those victim clients further stated that they had never seen the purported written agreements before being contacted by investigators in this case and that they never entered into any agreement, written or oral, like those described in the purported written agreements.  They also will testify that the defendant provided no (or few) services for which they believe he was not fully compensated through contemporaneous investment commissions.  In sum, the two victim clients will testify that the purported agreements are bogus, fabricated by the defendant without their knowledge, and that they never entered into any agreement like those the documents purport to memorialize.

One victim client, who initially alleged that the defendant fraudulently induced her payments to PSB Sports, later recanted and did not directly deny knowledge of the one subject document purportedly pertaining to her.  Instead, she stated that the signature on the document appears to be hers and that if there was an agreement, then she must have owed the defendant the money.  Despite the defendant's apparent theft of her money, this victim (who had spoken with the defendant between the time of her initial allegations and her recantation) remained convinced that the defendant had her best interests at heart and remained a very important person in her life.  One of her last statements to investigators was, "Whatever he did with the money is fine with me.  He is more important to me than the money."

### G. **Other Suspicious Circumstances of the Production of the Subject Documents**

It is also important to note that, in addition the victims' denials that they had ever seen the subject documents before and the other red flags already described, there was no evidence of the documents in any of the places where it would be reasonable to expect to find evidence of the documents if they were, in fact, genuine. Forensic searches of the defendant's available computers turned up no evidence of the subject documents (or for that matter of any financial or estate planning work product that would justify the payment of fees in the hundreds of thousands of dollars.) Nor did a search of the defendant's office after his departure from Prudential Securities. The defendant's secretary at the time has never seen the subject documents. Finally, while the defendant stated during his investigative interview that his lawyer had prepared documents that would explain the transfers, each of the four lawyers known to have represented the defendant during the relevant period has denied preparing the subject documents or any other documents that might explain the transfers.

### H. **The Defendant Is a Proven, Habitual Document Counterfeiter**

#### 1. **Prior Judicial Findings that the Defendant Is a Document Faker**

The defendant already has been proven a document faker. In 2010, the defendant was fighting charges of a fraud (unrelated to the scheme charged in the indictment) in a civil case then pending Suffolk County (Massachusetts) Superior Court. The gist of the charges against the defendant in that case was that he fraudulently induced a client, Samuel Pietropaolo, Sr., (Samuel, Sr.) to purchase a life insurance policy, from which the

defendant earned a large commission.  The defendant was charged with misrepresenting the policy's terms and benefits, in particular its death benefit.  According to the plaintiffs in the case, the defendant sold them a policy the defendant said was worth $500,000 when in fact it was only worth $200,000.  The plaintiffs also alleged that, after the truth about the policy emerged, the defendant misrepresented what he was doing to remedy the damages to the by-then deceased Pietropaolo and his estate.

On the night before the trial was scheduled to begin, the defendant produced to his lawyer several purportedly critical documents.  One of those documents was called a Policy Receipt Form purportedly signed by the plaintiffs, which, if authentic, would have constituted a complete or nearly complete defense to the plaintiff's case.  Without taking a position on the authenticity of the documents, the defendant's lawyer produced the documents to the plaintiff's lawyers.  The plaintiffs maintained that the documents were fakes and challenged their validity.  As part of extensive <u>voir doir</u> the morning trial was supposed to begin, the defendant testified at length.  In his testimony, he stated that he had just located the documents <u>in his storage unit</u>.  The court excluded the documents, including the Policy Receipt Form based upon authenticity claims.

After a twelve day trial resulted in a jury verdict in favor of the plaintiffs, Justice Margaret R. Hinkle made explicit findings that, during the trial, the plaintiffs established that the defendant had resorted to lying and, more importantly for purposes of the issues presented by this motion, fabricating bogus documents to conceal his fraud.  The following are excerpts from the court's findings of fact on certain issues reserved for

determination by the court, dated February 12, 2010, including the court's comments

regarding the defendant's document faking:

> McMenimen earned a commission of approximately $11,000
> from Provident Mutual on Samuel, Sr.'s $200,000 Policy.
> After its issuance, McMenimen instructed Samuel Pietropaolo
> Jr. (Sam Jr.) and Passatempo [a trustee of the Pietropaolo
> family trust] to send the monthly premiums for the Policy to
> him and told them that he would "watch" the account.  He
> told Sam, Jr., and Passatempo that the account would become
> "self-funding" at a certain point and would pay for itself.
> <u>These statements were untrue</u>…

*       *       *       *

> After plaintiffs signed these forms, McMenimen told the
> plaintiffs that he had obtained a policy with death benefits of
> approximately $489,000.  <u>This statement is untrue.</u>

*       *       *       *

> According to McMenimen, when [Sam Jr.] made inquiries
> about Samuel, Sr.'s policy, he was referred to Paul
> Tomassini, [another agent at the firm for which McMenimen
> worked at the time] … McMenimen claimed that on June 2,
> 2003 Tomassini spoke with someone in the underwriting
> department and developed a plan to convert the cash value to
> death benefit to increase the death benefit value to $489,000.
> <u>This was untrue.</u>
>
> In July 2003, McMenimen sent Sam, Jr. and Passatempo
> signed forms prepared by McMenimen which he claimed
> accomplished Tomassini's plan.  After plaintiffs signed these
> forms, McMenimen told the plaintiffs that he had obtained a
> policy with death benefits of approximately $489,000.  <u>This
> statement is untrue…</u>

*     *     *     *

By July 1, 2004, the Pietropaoloses determined that the policy had never been "converted" to a $500,000 policy. At this time, McMenimen blamed Tomassini for the lack of conversion. Tomassini testified at trial that he never sent "conversion" forms to McMenimen or received them from him. I credit that testimony. McMenimen asserted that on July 1, 2004, Tomassini sent him the following email:

> Per our conversation I have received the forms that you had signed by the trustee and I will submit them. Effective July 5, which is the anniversary date the policy face amount will be changed via a change in death benefit options to $489,512. …
>
> Your Uncle will receive the updates in his next statement . I will forward a copy to you. I am sorry about the confusion and the underwriter. I will take the heat for you if needed. Its [sic] our fault here and not yours. If we have any other issues I will call you.

Tomassini testified that he never sent this e-mail. <u>I credit that testimony and find that McMenimen fabricated this e-mail.</u> McMenimen also claimed that Tomassini sent another e-mail dated August 21, 2004:

> This is to confirm our conversation yesterday. I did send in the paperwork and the death benefit as of today is 489,512. I will forward a statement to you at the end of September. The underwriter did me a favor on this one. Please do not call. I do not want to put her in an awkward position again. Thanks for the Sox tickets as well. We had fun. Let's catch up soon.

<u>I discredit this testimony.</u> Tomassini credibly testified at trial that this was not his e-mail, that an underwriter did not do

him a "favor," and that he never gave Red Sox tickets to
McMenimen.  I credit this testimony...

*       *       *       *

In 2004, McMenimen gave Sam, Jr. a policy schedule
indicating a face amount of $500,000, with his handwriting
stating "Max Amount/Current."  <u>McMenimen fabricated this
document.</u>

Findings of Fact, Rulings of Law and Order On Plaintiff's Chapter 93 Claim, <u>Ronald P.

Passatempo, et al. v. Frederick v. McMenimen, III, et al.,</u> Suffolk County Superior Court

Civil Action No. 06-0205 B1.SI, pp. 6-9 (emphasis added).  Characterizing

McMenimen's conduct as "repeated egregious acts of affirmative deception" that

"deprived the plaintiffs of actual knowledge of the amount of the [p]olicy and of their

opportunity to unravel what McMenimen had done," the court also wrote:

As my findings show, McMenimen gradually shifted from failing to disclose to
plaintiffs the truth about the $200,000 face value of the Policy to blatantly
misrepresenting the true policy terms.  <u>McMeniemn altered documents</u> and
attempted to shift blame to another agent [Tomassini] in an effort to lull the
plaintiffs into ignoring the truth about the policy terms.  By any measure,
McMenimen acted towards the plaintiffs with the conscious objective of
committing repeated deceptive acts.

<u>Id.,</u> at p. 11 (emphasis added).

A full copy of Justice Hinkle's post-trial written opinion and findings of fact are

attached hereto as Exhibit 2.

### 2. The Defendant Fabricated and Submitted False Documents to His Accountant in Connection with the Preparation of His Tax Return

The evidence also clearly establishes that in 2010 the defendant fabricated and altered documents that he then submitted to his accountant, John Masci, in connection with the preparation of the defendant's 2009 federal income tax return.  Masci, who was preparing that return for the defendant, asked the defendant for back-up documentation showing the source of a particular income item that the defendant had included on a spreadsheet that the defendant had prepared and previously given to Masci.  The actual principal source of the income was one of the victim clients and it seems that the defendant included the payment on the income spreadsheet by mistake.

In an apparent effort to conceal from Masci that the money had actually come principally from one of his victim clients, the defendant fabricated a copy of a check that he then sent to Masci.  Compare the photocopy of check #1029 that the defendant provided Masci payable to Custom Financial in the amount of $38,000, attached hereto as Exhibit 3.A, with the official bank copy of the check #1029 payable to Pruco Securities in the amount of $25,000 as actually negotiated, attached hereto as Exhibit 3.B.  To complete the ruse, the defendant printed out an internet bank statement, altered it make it appear that he actually deposited the fabricated check and then sent the altered bank statement to Masci with the fabricated check.  Compare the altered internet bank statement that the defendant provided Masci , attached here as Exhibit 3.C, with the official bank statement, attached hereto as Exhibit 3.D. [2]

---

[2]  The extent to which Masci incorporated the false information into the defendant's tax returns is not clear.

3.    **Evidence of Additional Instances in Which the Defendant Has Falsified Documents**

There is evidence of additional instances in which the defendant has falsified documents.  For example, according to a lawyer representing the defendant in a 2008 lawsuit regarding a fee dispute, the defendant provided the lawyer with emails that were favorable to the defendant's case.  After they were produced to the side, the defendant's adversary accused the defendant of falsifying the emails.  Another example of similar conduct involves the defendant's apparent falsification of an instruction to change the beneficiary of an annuity issued to a client from an individual to a trust.  It appears that the defendant falsified that document to create the false appearance that he had timely complied with a since deceased client's request to make the change.

## II.    DISCUSSSION

### A. Authentication

A document must be authenticated before it can be admitted into evidence.  United States v. Paulino, 13 F.3d 20, 22 (1st Cir. 1994).  According to Rule 901 of the Federal Rules of Evidence:

> To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

Fed. R. of Evid., Rule 901(a).  The proponent of a document bears the burden of authenticating the proffered document by showing that it is reasonably likely that the item is what he claims it to be.  United States v. Holmquist, 36 F.3d 154, 168 (1st Cir.

1994).  A trial court's authentication ruling is reviewed for abuse of discretion.  <u>United States v. Alicea-Cardoza</u>, 132 F.3d 1, 3 (1st Cir.  1997) ("Because authentication rulings are necessarily fact specific, we review such rulings only for mistake of law or abuse of discretion.").

For documents, the authentication requirement can be satisfied by, among other things, testimony from a person with knowledge that the document is what its proponent claims it is, <u>Fed. R. of Evid.</u>, Rule 901(b)(1), expert testimony identifying handwriting, <u>Fed. R. of Evid.</u>, Rule 901(b)(3), or any other method provided by statute or rule, <u>Fed. R. of Evid.</u>, Rule 901(b)(10).  In addition, Rule 902 of the Federal Rules of Evidence allows for the self-authentication of certain categories of documents that are well-recognized as genuine on their face.  <u>Fed. R. Evid.</u>, Rule 902.  Documents that fall within any of the listed categories are considered self-authenticating, that is such documents are deemed to have been sufficiently reliable that extrinsic evidence of authenticity is rendered not necessary.

One of the categories of self-authenticating documents listed in Rule 902 is "Certified Domestic Records of a Regularly Conducted Activity."  <u>See</u> <u>Fed. R. Evid.</u>, Rule 902(11).  Under Federal Rule of Evidence 902(11), originals or copies of a domestic record are self-authenticating if they "meet[] the requirements of Rule 803(6) (A) – (C), as shown by a certification of a custodian or other qualified person."  <u>Id.</u>  Rule 803(b)(6) is the business records exception to rule against the admissibility of hearsay, and the requirements of Rule 803(b)(6)(A) – (C) specifically are that the document is a "record of an act, event, condition, opinion or diagnosis" and:

(A)   the record was made at or near the time by – or from information transmitted by – someone with knowledge;

(B)   the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling …; [and]

(C)   making the record was a regular practice of that activity.

Fed. R. Evid., Rule 803(b)(6).  A party seeking to authenticate records of a regularly conducted activity using Rule 9902(11) must give his adversary sufficient advance notice of his intention and make both the documents and the certification available to provide his adversary a reasonable opportunity to challenge the foundation for authenticity set forth in the certification.

The foundation for authentication under Rule 902(11) may be attacked by the party against whom the evidence is offered.  As one court noted, "[T]he Rule does not give a party license to dump business records into evidence without giving an adverse party an opportunity to question the certificate's signer where such questioning is warranted."  United States v. Green, 648 F.3d 569, 580(7th Cir. 2011), citing United States v. Adefehinti, 510 F.3d 319, 327-28 (D.C. Cir. 2008) (amended opinion); see United States v. Brown, 553 F.3d 768, 792-93 (5th Cir. 2008) ("The notice requirements of Rule 902(11) are in place precisely to ensure that evidence to be accompanied by an affidavit can be vetted for objection or impeachment in advance.  While the Rule 902(11) certificate does not fall within the guarantee provided by the Confrontation Clause, the "opportunity to challenge" referred to in the rule may include cross-examination).   If an adversary challenges the foundation for the authentication of a proffered document, and especially if the adversary offers extrinsic proof contesting the authenticity of the

document, the court is faced with a preliminary question of fact to be resolved.  In instances where authenticity is questioned, the burden remains on the proponent of the document to persuade the Court that the item truly is what it purports to be.  Weinstein, Federal Evidence, § 902.02[2], citing e.g., Nolin v. Douglas County, 903 F.2d 1546, 1552 (11th Cir.  1990).

In this case, there is only one person who purports to have been aware of the existence of the subject documents.  The defendant will not call any witnesses who can testify that he or she saw the victim clients sign the subject documents, nor can he call the victim clients to admit that the signatures on the documents are theirs because they adamantly deny that they signed the subject documents.  The defendant also is not expected to call a handwriting expert to testify that, based upon handwriting comparisons, it is his or her expert opinion that the victim clients placed their signatures on the subject documents. [3]  Accordingly, the only potential methods for authenticating the subject documents available to the defendant are through the testimony of the defendant himself or alternatively through a certification from the defendant that satisfies the requirements of Rule 902(11).  In the unlikely event that the defendant chooses to waive his Fifth Amendment privilege against self-incrimination and attempts to establish authenticity by testifying, the government will have an opportunity to challenge his authentication testimony on cross-examination and the introduction of rebuttal evidence.  If the

---

[3]    The defendant has retained a questioned documents expert who reviewed the originals of the subject documents on December 9, 2013.  Because the defendant's deadline for making expert disclosures has come and gone with no disclosures, the government infers that the results of that analysis were either not conclusive or favorable to the defendant.  The government has sought an opinion for a questioned document examiner as well but is not expecting to receive the results of that analysis for another couple of weeks at the earliest.

defendant elects to proceed under 902(11), the government will also have an opportunity to introduce evidence to rebut his certification.

In either instance, the government's rebuttal evidence will include testimony from the victim clients, the defendant's secretary, the defendant's attorneys, law enforcement agents and others that, among other things:

- establishes that the defendant is a proven and chronic document faker;

- the victims categorically deny seeing or even knowing about the existence of the subject documents which the defendant claims they signed;

- the fee agreements the subject documents purport to reflect are highly implausible;

- the victims never agreed to the agreements that the subject documents purport to reflect;

- the manner in which the defendant handled the funds after receiving the payments from the victims is not consistent with the notion that the funds were legitimately earned pursuant to the agreements the subject documents purport to reflect;

- few, if any, original versions of the subject documents have been produced;

- the defendant has provided differing excuses at different times for his inability to promptly and completely produce documents reflecting the agreements purportedly reflected in the subject documents; and

- the documents were not found in any files, offices or computers of the places in which, if they were authentic, they would reasonably be expected to be found.

Courts have excluded exculpatory evidence offered by the defendant on authentication grounds under circumstances far less compelling than those present here. See e.g., Brown, 553 F.3d at 792-93 (5th Cir. 2008) (exclusion of pharmacy records offered by defendants to show that illegal drug transactions were such a small part of pharmacy's receipts that defendants had no economic incentive join in conspiracy on ground that prosecution was not given opportunity to challenge 902(11) submitted by defendants).

## B. Hearsay

In addition to its objection on authenticity grounds, the government objects to the admissibility of the subject documents on hearsay grounds. A document is not admissible simply because it has been authenticated. The proponent must still clear the other hurdles to admissibility. So, for example, if an authenticated document is offered to prove the truth of assertions made within it, the proponent must show that it is not barred by the rule against hearsay.

The subject documents contain textbook hearsay. Hearsay is defined to mean a statement that the declarant makes, other than in his or her testimony at trial, which a party offers in evidence to prove the truth of the matter asserted. Fed. R. Evid., Rule 801(b) and (c); see United States v. Cameron, 699 F.3d 621, 642 (1st Cir. 2012). While the documents purport to be legal instruments typically deemed "verbal acts" not subject to hearsay challenge, Florence Nightingale Nursing Services, Inc., v. Paul Revere Life

Ins., 60 F3d 809 (Table), 4 (1st Cir. 1995), they contain numerous exculpatory out of court statements made by the defendant on all of the issues central to the fraud charges but completely unnecessary to the legal sufficiency of the instruments. Absent any other rationale for their introduction, the defendant offers those extraneous, self-serving out-of-court written statements contained within the purported agreements for the truth of the matter asserted and those statements are therefore hearsay.

The subject documents also include handwritten notations and comments which the defendant has not established were contained within the instruments at the time into which the would-be agreements were purportedly entered. To the extent they cannot be shown to have been necessary parts of the legal instrument at the time it was created and are introduced for the truth of the matter asserted, they too constitute hearsay.

Because the gratuitous self-serving statements and the handwritten notations are hearsay, they are inadmissible unless they fall within one of the enumerated exceptions to the hearsay rule. The only arguably applicable exception is the business records exception set forth in Rule 803(6), which provides as follows:

**Records of a Regularly Conducted Activity**. A record of an act, event condition, opinion, or diagnosis, if:

(A)     the record was made at or near the time by – or from information transmitted by – someone with knowledge;

(B)     the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)     making the record was a regular practice of that
        activity;

(D)     all these conditions are shown by the testimony of the
        custodian or another qualified witness, or by a
        certification that complies with Rule 902(11) or (12) or
        with a statute permitting certification; and

(E)     neither the source of information nor the method or
        circumstances of preparation indicate a lack of
        trustworthiness.

Fed. R. Evid., 803(6); see e.g., United States v Kayne, 90 F.3d 7, 12-13 (1st Cir. 1996).

As discussed above in the context of authentication and Rule 902(11), the defendant

cannot satisfy paragraphs (A) – (C) of Rule 803(6) because his foundation for those

requirements in contained in a Certificate of Authenticity that does not pass muster.  See

United States v. Borrasi, 639 F.3d  774 (7th Cir.  2011) (no abuse of discretion in

precluding defense from introducing exculpatory reports because they were hearsay and

no foundation for their admission was established even though the reports were referred

to in committee minutes whose admissibility as business records was stipulated to);

United States v. Rogers, 556 F.3d 1130 (10th Cir.  2009) (irregularities with respect to the

creation and maintenance of exculpatory documents indicated lack of reliability so as to

preclude admission under business records exception to hearsay rule.); United States v.

Kim, 595 F.2d 755 (D.C. Cir.  1979) (court rejected an argument that the defendant

should have been permitted to introduce an exculpatory telex from the Korean Exchange

Bank stating that the defendant had withdrawn a large sum of money from his account on

a designated day because the trial judge could have concluded that the circumstances of preparation of the telex indicated a lack of trustworthiness).

Even if all of the foundation requirements of the rule are met, the Court has the discretion to exclude a business record if the source of the information contained in it or the method or circumstances of its preparation indicate a lack of trustworthiness as provided in paragraph (E).  See United States v. Munoz-Franco, 487 F.3d 25, 39 (1st Cir. 2007) (Rule 803(6) excludes business records if the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.)  That is the case here.

Many of the reasons the defendant will be unable to satisfy paragraph (E) already have been discussed above in the context of authentication.  But it also is important to note that when the record keeper or custodian is a party to the litigation with a strong motive to falsify records, the records should be subjected to an enhanced standard of trustworthiness as a prerequisite to the application of the hearsay exception.  As the Seventh Circuit has stated in reference to the exclusion of defense evidence introduced under the parallel hearsay exception for public records, when documents are prepared by the defendant rather than disinterested persons, they are more likely to lack sufficient indicia of trustworthiness to satisfy paragraph (E).  United States v. Spano, 421 F.3d 599, 604 (7th Cir.  2005) (when the record keeper, rather than being a clerical or professional employee is a s principal with strong motive to falsify the records, the district judge  may deem them so unreliable as to be unworthy of consideration by the jury;  in the language of the rule , they are to be excluded if 'the method or circumstances of preparation

indicate lack of trustworthiness,' quoting <u>Kikalso v. United States</u>, 408 F.3d 900, 904

(7the Cir. 2005)).  This is especially so where, as here, the source of the documents is a

defendant, accused of fraud in the very dealings his writings seek to explain.  <u>United</u>

<u>States v. Crumpler</u>, 229 Fed. Appx. 832, 2007 WL 1095136 (11th Cir. 2007).

## III.   <u>CONCLUSION</u>

The subject documents are not worthy of the jury's consideration and should be

excluded.  They are not authentic and, in fact, due consideration of all of the evidence

establishes overwhelmingly that they are bogus.  While their exclusion from the

defendant's case certainly is not in the defendant's interest, the rightful exclusion of

exculpatory evidence because it is not admissible under the applicable rules does not

implicate the Sixth Amendment right to present exculpatory evidence.  See <u>United States</u>

<u>v. Patrick</u>, 248 F.3d 11, 24 (6th Amendment) (1st Cir. 2001) (exclusion of police notes

referring to other suspects in murder case as hearsay did not violate defendant's 6th

Amendment right to present exculpatory evidence); <u>United States v. Brown</u>, 553 F.3d

768 (5th Cir. 2008) (rightful exclusion of exculpatory evidence for lack of authentication

does not implicate Sixth Amendment right to present a defense).

Therefore, the government respectfully requests that the Court grant its motion to exclude the subject documents and, in the alternative, to exclude those parts of the subject documents that constitute inadmissible hearsay.

Dated:  February 21, 2014                Respectfully submitted,

                                         JOHN P. KACAVAS
                                         United States Attorney


                              By:    /s/ William E. Morse
                                     William E. Morse
                                     Assistant United States Attorney
                                     Bar No. 421934 (D.C.)
                                     United States Attorney's Office
                                     53 Pleasant Street, 4th Floor
                                     Concord, New Hampshire  03301
                                     (603) 225-1552


**CERTIFICATE OF SERVICE**

I, hereby certify, that a copy of the foregoing has been filed electronically and served upon Bjorn Lange, Esq., counsel for the defendant.

                                     /s/ William E. Morse
                                     William E. Morse
                                     Assistant United States Attorney