EXHIBIT 2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                                CIVIL ACTION
                                                NO. 06-0205 BLS1

RONALD P. PASSATEMPO, TRUSTEE,
ON BEHALF OF THE SAMUEL PIETROPAOLO IRREVOCABLE
TRUST, SAMUEL PIETROPAOLO, AS EXECUTOR OF THE ESTATE OF SAMUEL
PIETROPAOLO AND PATRICIA D. PIETROPAOLO, BENEFICIARY OF THE
SAMUEL PIETROPAOLO IRREVOCABLE TRUST,
                                                Plaintiff

vs.

FREDERICK V. MCMENIMEN III AND
BARRY G. ARMSTRONG,
                                                Defendants

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER ON PLAINTIFFS' CHAPTER 93 CLAIM

This case arises out of claims of fraud and negligence surrounding a life insurance policy on the late Samuel Pietropaolo ("Samuel, Sr."). The plaintiffs allege generally that the defendants misrepresented the terms and benefits of a Nationwide Provident Flexible Premium Variable Life Insurance Policy ("the Policy") and that defendant Frederick V. McMenimen III ("McMenimen"), after the truth about the policy emerged, misrepresented what he was doing to remedy the situation. After a tortuous procedural history,[1] the case proceeded to trial. The jury found that defendant McMenimen the nephew of Samuel, Sr., fraudulently concealed from

---

[1] The Court assumes that the reader has some familiarity with this history. See, e.g. McMenimen v. Passatempo, 452 Mass. 178, 179 (2008) ("the case has an unnecessarily complicated and prolonged history.")

plaintiffs that the policy at issue lacked a $500,000 death benefit. The jury also found that the plaintiffs lacked actual knowledge until July 2001 that the Policy did not have a $500,000 death benefit, and that plaintiffs, through reasonable diligence, should have known by July 1, 2001 that the Policy lacked the $500,000 death benefit. The jury further found McMenimen liable for intentional misrepresentation regarding the $500,000 death benefit, and awarded plaintiff $300,000 in damages, the difference between the $500,000 death benefit that plaintiffs thought existed, and the actual $200,000 death benefit. On the negligence claim, the jury found that McMenimen and defendant Barry G. Armstrong ("Armstrong"), president and owner of New England Advisory Group, LLC (NEAG) and the individual who hired McMenimen, were each liable for negligence. The jury also found that the plaintiffs were contributorily negligent.

Presently before the Court is plaintiffs' Chapter 93A claim, which was reserved for the Court.

## FINDINGS OF FACT

For purposes of the 93A determination, I adopt the jury findings as to intentional misrepresentation and fraud.[2]

---

[2] While the jury also made negligence findings, those finding, in themselves, are insufficient for 93A liability. See Meyer v. Wagner, 429 Mass. 410, 424 (1999). In addition, I specifically decline to adopt the jury's negligence finding regarding Armstrong. I adopt the jury findings on negligence as to McMenimen and the contributory negligence of plaintiffs, but I do not ground my 93A rulings on those findings.

2

Plaintiffs filed this action on July 1, 2004. On or about that same day, Ronald P. Passatempo ("Passatempo")] sent McMenimen by certified mail a Chapter 93A demand letter. Passatempo, an attorney, was the Trustee of the Samuel Pietropaolo Irrevocable Trust. While McMenimen denies having received the letter, I discredit that testimony. Instead, I credit Passatempo's testimony that he sent the letter to McMenimen's address, and I also credit Samuel Pietropaolo's ("Sam, Jr.") testimony that after McMenimen received the 93A demand letter, he told Sam, Jr. that he had received it, and he complained about being "dragged" into litigation. Passatempo also sent a 93A demand letter dated July 1, 2004 to Armstrong. The letter does not expressly mention Armstrong and fails to identify or describe any unfair or deceptive act or practice of Armstrong.

The lawsuit arises out of events beginning in the summer of 1997 after Samuel Pietropaolo ("Samuel, Sr.") retired from the Revere school system and sought advice through his son Sam, Jr. from his nephew, McMenimen, about his retirement benefits options. At all relevant times, McMenimen was an experienced insurance agent and a broker and held himself out as knowledgeable in the field of pension maximization.

McMenimen analyzed Samuel, Sr.'s financial needs and concluded that if Samuel, Sr. were "insurable," he would advise him to select Option A under the Teachers Retirement Board Options (MTRB), which had no survivor benefits, and to purchase $500,000 in death benefits. At the time, Samuel, Sr. had two existing whole life standard policies at John Hancock Life Insurance Company with a death benefit of about $147,000 and a monthly premium of approximately $458.00.

3

Around September 22, 1997, McMenimen told Sam Jr. that Mutual of New York ("MONY"), had approved his father's application for a standard policy and that he was "insurable." As a result, McMenimen advised Sam, Jr. that Samuel, Sr. elect Option A of the MTRB selection form and his wife waive her survivor benefits. The Option A election, made on September 22, 1997, was irrevocable.

On December 1, 1997, based upon McMenimen's advice, Samuel Sr. established an Irrevocable Trust with Ronald P. Passatempo as Trustee, to hold the life insurance policy and administer proceeds after his death. The Pietropaolos selected Passatempo as Trustee based upon McMenimen's advice that the trustee be an unrelated person. On December 19, 1997, MONY issued Samuel Sr. a standard universal life policy with a death benefit of $350,000, with monthly premiums of $1,333.33.

On or about January 1, 1998, McMenimen applied for employment at Provident Mutual Life Insurance Company ("Provident Mutual"). He was offered and accepted employment by February 4, 1998, and entered into a formal agreement with Provident Mutual on February 23, 1998. On February 18, 1998, McMenimen resigned from MONY.

New England Advisory Group, LLC ("NEAG") was a marketing entity for Provident Mutual, known as an "agency" or "field office." At all relevant times, Armstrong was an agent for Provident Mutual (called either a "general agent" or a "managing agent"). Armstrong hired McMenimen and was his supervisor.

After McMenimen's employment by Provident Mutual, he attempted to place Samuel, Sr. into a $500,000 life insurance policy with his new company. Pietropaolo completed

4

portions of the Provident Mutual application, and McMenimen filled out other portions. McMenimen told the Pietropaolos that the reason for the Provident Mutual application was to "shop for a better deal." Armstrong had no involvement in procurement of the Policy.

By May 1, 1998, Provident Mutual had declined Samuel, Sr.'s application based upon medical records reviewed by its underwriters which showed that Samuel, Sr. had, at some point in the past, been diagnosed with chronic obstructive pulmonary disease (COPD). There is no evidence that this condition had been revealed to McMenimen, and Samuel Sr. did not reveal the COPD diagnosis on a questionnaire he completed relating to the policy.

Instead of advising Samuel, Sr. to retain the existing MONY and the John Hancock policies, which totaled $500,000 in death benefits, McMenimen told Sam, Jr. that the Provident Mutual application had been approved for $500,000. This assertion was false. McMenimen then directed Samuel, Sr. to non-take the MONY policy, and he told Sam, Jr. and Passatempo to send him a letter to that effect. Following that advice, on April 30, 1998, Sam, Jr. sent McMenimen a letter authorizing him to non-take the MONY policy based upon McMenimen's representation that Samuel, Sr.'s $500,000 Provident Mutual application had been approved. Despite the "non-take" authorization, the MONY policy remained in effect until June 24, 1998, at which time it lapsed for non-payment.

At the end of May 1998, Sam, Jr. received a May 8, 1998 letter "re-sent" on May 28 (to the correct address) from Provident Mutual stating that the company had declined Samuel Sr.'s application. The letter was addressed to the Trust c/o Passatempo. In response, Sam Jr. called McMenimen, who told Sam Jr. and Passatempo that this letter was a "mistake," that he had

5

"fixed" it, and that he had "restructured" the policy into "two components," a $200,000 policy in "front," with the remainder in "back" for a total guaranteed death benefit of $500,000. In fact, Provident Mutual had declined the $500,000 policy and closed its file on the matter.

The $200,000 Policy was issued on July 28, 1998. On or about August 29, 1998, following McMenimen's instruction, Samuel, Sr. cancelled his John Hancock policies and requested their cash surrender value, and authorized payment of the $26,416 cash surrender value to Provident Mutual for his "$500,000" policy.

On October 11, 1998, Provident Mutual sent a "FINAL NOTICE" to McMenimen requiring a signed application for Samuel, Sr.'s $200,000. policy. In response, on October 16, 1998, McMenimen took the signature line from Samuel, Sr.'s March 5, 1998 $500,000 application, transposed the signature lines onto a new $200,000 application form, and faxed that document to Provident Mutual.

McMenimen earned a commission of approximately $11,000 from Provident Mutual on Samuel, Sr.'s $200,000 Policy. After its issuance, McMenimen instructed Sam, Jr. and Passatempo to send the monthly premiums for the Policy to him and told them that he would "watch" the account. He told Sam, Jr. and Passatempo that the account would become "self-funding" at a certain point and would pay for itself. These statements were untrue.

Passatempo paid the first premium for the Policy on July 31, 1998. Thereafter, McMenimen fraudulently concealed from the plaintiffs the fact that there was no $500,000 death benefit. Sam, Jr. and Passatempo at various times from 1998 through 2003 received quarterly statements, premium payment confirmations and policyholder statements from

6

Provident Mutual showing a $200,000 death benefit. However, they never received a copy of the policy itself.

In or around April 2003, Samuel, Sr. received a phone call from Jessie McPhail, an agent with NEAG, who told Sam, Sr. that the Provident policy had been "orphaned" and was now McPhail's responsibility. From his conversation with McPhail, Samuel, Sr. realized that the Provident policy was only a $200,000 policy, with no other components. When Sam, Jr. told McMenimen of the conversation with McPhail, McMenimen responded "stay out of it" and told him to "tell that agent to stop asking questions."

According to McMenimen, when he made inquiries about Samuel, Sr's policy, he was referred to Paul Tomassini, an NEAG agent. McMenimen claimed that on June 2, 2003, Tomassini spoke with someone in the underwriting department and developed a plan to convert cash value to death benefit to increase the death benefit value to $489,000. This was untrue. In July 2003, McMenimen sent Sam, Jr. and Passatempo signed forms prepared by McMenimen which he claimed accomplished Tomassini's plan. After plaintiffs signed these forms, McMenimen told the plaintiffs that he had obtained a policy with death benefits of approximately $489,000. This statement is untrue.

By July 1, 2004, the Pietropaolos determined that the policy had never been "converted" to a $500,000 policy. At this time, McMenimen blamed Tomassini for the lack of conversion. Tomassini testified at trial that he never sent "conversion" forms to McMenimen or received them from him. I credit that testimony. McMenimen asserted that on July 1, 2004, Tomassini sent him the following e-mail:

7

> Per our conversation I have received the forms that you had signed by the trustee and I will submit them. Effective July 5, which is the anniversary date the policy face amount will be changed via a change in death benefit options to 489,512. We will change the investment options as directed effective the same day.
>
> Your Uncle will receive the updates in his next statement. I will forward a copy to you. I am sorry about the confusion and the underwriter. I will take the heat for you if needed. Its our fault here and not yours. If we have any other issues I will call you.

Tomassini testified that he never sent this e-mail. I credit that testimony and find that McMenimen fabricated this e-mail.

McMenimen also claimed that Tomassini sent another e-mail dated August 21, 2004:

> This is to confirm our conversation yesterday. I did send in the paperwork and the death benefit as of today is $489,512. I will forward a statement to you at the end of September. The underwriter did me a favor on this one. Please do not call. I do not want to put her in an awkward situation again. Thanks for the Sox tickets as well. We had fun. Let's catch up soon.

I discredit this testimony. Tomassini credibly testified at trial that this was not his e-mail, that an underwriter did not do him a "favor," and that he never gave Red Sox tickets to McMenimen. I credit this testimony.

In 2004, McMenimen gave Sam, Jr. a policy schedule indicating a face amount of $500,000 with his handwriting stating "Max Amount/Current." McMenimen fabricated this document. In an April 16, 2004 e-mail, McMenimen wrote:

> I want to apologize for this. I along with you thought based on the e-mails and forms that it was all set. I want to insure that your dad should not worry. IT WILL be handled properly and I would NEVER let you, your mom or dad be harmed by this in any way. I think its best said that family takes care of family and this will be

8

> settled right away. I am not going to let NEAG and their actions
> or lack of actions have a negative impact on family. I feel sick
> about it. I will push hard as I can on this. . . .I truly feel we can get
> a quick resolution. It will get resolved and I am sorry.

Samuel, Sr. died on April 1, 2005. Before Sam, Jr. was admitted to the bar in 1996, he worked for McMenimen in a branch office of John Hancock Financial Services and at two Hancock companies, including John Hancock Variable Life Insurance Company.

Because of his familial relationship and his claim of superior knowledge about insurance, McMenimen served in a fiduciary relationship to plaintiffs at all relevant times. By contrast, I conclude that plaintiffs had no fiduciary relationship with Armstrong.

## RULINGS OF LAW

McMenimen argues that the plaintiffs failed to prove delivery of the demand letter, claims that no private right of action exists under 93A § 9 for misrepresentation inducing purchase of a life insurance policy, and that the 93A claim is time-barred under the four year statute applicable to consumer protection actions, G.L. c. 260, § 5A. Each argument fails.

Turning first to the limitations issue, plaintiffs argue that the jury verdict of fraudulent concealment and "no actual knowledge" tolls the limitations statute under c.260, § 12 and applicable caselaw such as Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 519 (1997) and Clough v. Brown, 59 Mass. App. Ct. 405, 407 (2003). I agree. McMenimen's repeated egregious acts of affirmative deception outlined above deprived the plaintiffs of actual knowledge of the amount of the Policy and of their opportunity to unravel what McMenimen

9

had done.

McMenimen also argues that misrepresentations intended to induce the purchase of an insurance policy are not prohibited under c. 93A because in 1979 the legislature amended the private right of action under c. 93A, § 9 to include violations of G.L. c. 176D, § 3(g). McMenimen contends that this amendment excludes other violations of c. 176D, §3 from the ambit of c. 93A.. Judge Gants rejected this argument in his summary judgment ruling on November 4, 2008, and I do as well. The legislature, in amending the statute, could not have intended to protect insurance agents who engage in deception from the statutory remedies available under c. 93A. Thus, I conclude that McMenimen's conduct violates G.L. c. 176D § 3(1)(a) in that, as noted, he repeatedly misrepresented the terms and conditions of the Policy. He also breached c. 176D, § 3(1)(f) because his misrepresentations were intended to induce conversion of a policy.

Having found that McMenimen violated c. 93A, I move on to the appropriate relief. Plaintiffs argue that in addition to $300,000 in actual damages, I should award emotional distress damages to compensate Samuel, Sr. for the distress he experienced from learning that his wife would not receive the a $500,000 death benefit. However, on the record before me, plaintiffs have not sustained their burden of proof on this issue. Thus, I conclude that plaintiffs have actual damages in the amount of $300,000, the amount awarded by the jury on the misrepresentation claim.

Plaintiffs next argue that I should award multiple damages as a result of McMenimen's willful and knowing breach of c. 93A. A party's conduct is "knowing" and "willful" if the

10

defendant acts with the intention or the conscious objective of committing deceptive practices. Dataconm Interface, Inc. v. Computerworld, Inc., et al., 396 Mass. 760, 780 (1986) (fraudulent representations in knowing disregard of the truth). McMenimen's repeated material misrepresentations qualify as "knowing" and "willful" conduct. As my findings show, McMenimen gradually shifted from failing to disclose to plaintiffs the truth about the $200,000 face value of the Policy to blatantly misrepresenting the true policy terms. McMenimen altered documents and attempted to shift blame to another agent in an effort to lull the plaintiffs into ignoring the truth about the policy terms. By any measure, McMenimen acted towards plaintiffs with the conscious objective of committing repeated deceptive acts. Thus, I find, as a matter of law, that his violation of c. 93A was willful and knowing, which justifies a trebling of damages. I conclude that McMenimen must pay plaintiffs three times the underlying judgment of $300,000, plus the reasonable attorneys' fees plaintiffs incurred in prosecuting this action.

Turning to Armstrong, he argues that the 93A demand letter addressed to him was legally insufficient and that he did not engage in any conduct that was unfair or deceptive under c. 93A, § 2. Both arguments have merit. Plaintiffs simply have not shown that Armstrong engaged in any conduct that justifies c. 93 relief.

NH Insurance Department       Confidential RSA 400-A:16                001136

FM_NHID-01190

## ORDER

For the reasons stated, this Court **ORDERS** that:

1. Plaintiffs' c. 93A claim against defendant Barry Armstrong is **DISMISSED**.

2. As to defendant Frederick V. McMenimen, III plaintiffs are entitled to actual damages on the Chapter 93A claim of $300,000, plus interest, plus twice actual damages ($600,000) as punitive damages, resulting in treble damages.

3. No later than March 1, 2010, plaintiffs shall serve an application for reasonable attorneys' fees and costs, supported by an affidavit and appropriate documentation.

4. No later than March 22, 1010, McMenimen may serve an opposition to that application; plaintiffs may serve a reply no later than March 29, 2010, and the Rule 9A package shall be promptly filed. A hearing on the application for attorneys' fees shall be conducted on April 7, 2000 at 2:00 p.m.

5. Each party is invited to provide the Court with a proposed form of judgment at or before that hearing.

*Margaret R. Hinkle*
Margaret R. Hinkle
Justice of the Superior Court

DATED: February /2, 2010

12