IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA     ]

    ]

v.     ]          Cr. No. 12-Cr-130-SM

    ]

FREDERICK V. MCMENIMEN, III     ]

### DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION IN LIMINE NO. 1

Defendant Frederick V. McMenimen, through counsel, hereby responds to the

Government's Motion in Limine No. 1 for an Order Precluding Unauthenticated Forgeries and

Fabrications and Hearsay, *Document 55*, as follows.

There should be an evidentiary hearing on the government's limine motion and a ruling

thereon sufficiently prior to jury selection on November 4, 2014 so that the parties can respond

accordingly.   The government's motion should be denied.

### A.   Procedural History

McMenimen was indicted on October 3, 2012 for Mail Fraud (Counts One through Five),

Interstate Transportation of Stolen Property (Counts Six through Eighteen), Money Laundering

(Counts Nineteen through Twenty Eight), and Federal Income Tax Evasion (Counts Twenty Nine

through Thirty One). The gravamen of Counts One through Twenty Eight are allegations that

McMenimen, a financial advisor, defrauded financially unsophisticated widows, had them

liquidate legitimate investments and transfer the proceeds to him to re-invest on their behalf,

failed to re-invest the proceeds on behalf of the alleged victims, moved the proceeds in interstate

commerce, laundered them by depositing them into bank accounts he controlled, and diverted the

funds for his own purposes.   Federal jurisdiction rests on the use of means of interstate

commerce and of federally insured financial institutions to facilitate the alleged fraud and on the

tax laws.   In short, the first twenty eight counts recite allegations that McMenimen defrauded

widowed clients.    If their alleged transfers to him were not procured by fraud, then those counts

will not stand.    Counts Twenty Nine through Thirty One allege that in 2009, 2010, and 2011

McMenimen sought to evade income taxes due to the United States by failing to disclose all of

the income he earned.    Discovery suggests that at trial the government will seek to prove that

McMenimen evaded taxes by failing to include in his income tax returns for tax years 2008,

2009, and 2010 payments he received from the alleged victims of the frauds alleged in Counts

One through Nineteen.

McMenimen did not fraudulently induce payments from the alleged victims.   He submits

that the payments at issue were deferred compensation for extensive services he rendered to them

and their families, including financial management and estate planning.

Prior to returning the instant indictment the grand jury issued subpoenas to PSB Sports,

L.L.C. and Custom Financial L.L.C., entities through which McMenimen conducted some of his

business, for all documents from September 1, 2008 through November 20, 2011 reflecting the

reasons for any payments received from various individuals, including from the alleged victims.

In response to the subpoenas, on September 14, 2012 counsel for McMenimen hand-delivered to

the United States Attorney's Office in Concord, New Hampshire originals or copies of the

documents which are Attachments 1.A, 1.B, 1.C, 1.D, 1.E, and 1.F to the government' s limine

motion.   Accompanying those documents were two certificates of authenticity of domestic

business records pursuant to Federal Rule of Evidence 902(11), copies of which are attached to the

government's supporting memorandum as Exhibits 1.A and 1.B.   In those certificates

McMenimen executed on September 6, 2012 an attestation that he was the keeper of records for

PSB Sports and for Custom Financial respectively, that the documents produced pursuant to the

grand jury subpoenas were made at or near the time of the occurrence of the matters set forth by, or

from information transmitted by, a person with knowledge of those matters, that the records were

kept in the course of regularly conducted business activity of PSB Sports or Custom Financial, and

that such records were made by the respective entity as a regular practice.

The government's challenges to the authenticity of Attachments 1.A, 1.B, 1.C, 1.D, 1.E,

and 1.F and to their admissibility at trial are not well-founded.   Each of these six documents is

admissible as an adequately authenticated, contemporaneous memorialization of general

long-standing agreements to compensate McMenimen for his extensive services to each of three

women, their families, and their estates.   Attachments 1.A through 1.D memorialize evolving

agreements between Susan G. Wagstaff and McMenimen.   Attachment 1.E covers his agreement

with Patricia Mekshes.   Attachment 1.F pertains to Janet L. Beals.

> **B.   There is sufficient support for the authenticity of the contested documents to warrant their admission at trial pursuant to Rules 901 and 902(11) of the Rules of Evidence**.

The government's memorandum in support of its limine motion to exclude the six disputed

attachments argues that they, and by implication the certificates of authenticity which

McMenimen executed as the keeper of records for PSB Sports and Custom Financial, "were by all

appearances forged and fabricated by the defendant – *a proven, inveterate document*

*counterfeiter.*"   Government's Memorandum of Law, p. 1.   The Court should reject this *ad*

*hominem* attack and focus on pertinent evidence, which suffices to show that the contested

documents will be sufficiently authenticated at trial to be admitted as full exhibits.

Fed. Rule Evid. 901(a) does not set a high threshold to establish the authenticity of an item

of proffered evidence.

"To introduce a piece of evidence, the proponent must demonstrate 'that the item is what the proponent claims it is.' Fed. R. Evid. 901(a). This relatively undemanding rule 'requires the trial court to determine if there is a reasonable probability that the evidence is what it is purported to be.' United States v. Carlos Cruz, 352 F.3d 499, 506 (1st Cir. 2003 (quoting United States v. Neal, 36 F.3d 1190, 1210 (1st Cir. 1994)) (quotation marks omitted). The proponent 'need not rule out all possibilities inconsistent with authenticity' in order to meet this burden. Asociación De Periodistas De P.R. v. Mueller, 680 F.3d 70, 79 (1st Cir. 2012) (quoting United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997)) (quotation marks omitted). Evidence can be authenticated in numerous ways, including through the testimony of a witness with knowledge 'that an item is what it is claimed to be.' Fed. R. Evid. 901(b)(1).

United States v. Appolon, 715 F.3d 362, 371 (1st Cir.2013), *Cert. denied* 134 S. Ct. 335 (2013).

Among the ways a signed document can be authenticated are by testimony of a witness with knowledge, by non-expert witness' opinion that handwriting is genuine "based on a familiarity with it that was not acquired for the current litigation," or by a comparison with an authenticated specimen by an expert witness or the trier of fact. *Fed R. Evid. 901(b).* Comparison of the known signatures of Wagstaff, Mekshes, and Beals with the signatures on the disputed documents will sufficiently establish their authenticity to comply with Rule 901.

On March 19, 2014 the government gave the defense a copy of a February 24, 2014 report of an examination from the FBI Questioned Document Unit with supporting documentation. The report says that the Document Unit compared multiple documents bearing the known writing of Wagstaff, of Beals, and of Mekshes with the questioned documents now at issue. The known writings included checks, annuity applications, and withdrawal and disbursement requests. Although the Document Unit made no definite determinations about the authenticity of any of the questioned documents, it did not eliminate any as bearing fraudulent signatures of Wagstaff, of Beals, or of Mekshes. Its conclusions about specific documents will be addressed separately.

Attached hereto in PDF as Exhibit A is a copy of a letter dated March 12, 2007 and

addressed to IRS Revenue Agent Karen Dean.   It was included in portions of the investigative file

which the government provided to the defense as part of discovery.   It bears Wagstaff's signature

and indicates that it was sworn to and signed on March 13, 2007 before Attorney Mark Sullivan

acting as a justice of the peace. **1**   On September 11, 2012 government investigators reportedly

showed Wagstaff a copy of the letter.   She reportedly told them that McMenimen presented the

letter for her to sign so as to clear up a misunderstanding.   She said that she signed the document

without reading it.   It states that she had compensated McMenimen for his time and expertise in

resolving financial problems that arose after he husband passed away.

Included in the voluminous pre-trial discovery are numerous other documents which the

evidence will show, and which the government will not likely dispute, were signed by Wagstaff,

including requests to make disbursements from annuities.   Attached as Exhibit B is a copy of a

redacted portion of one such request.   It bears Wagstaff's signature.

When the Court (and the jury) compares Exhibits A and B, along with numerous other

likely undisputed writings by Wagstaff, by Megshes, and by Beals, the similarities to the disputed

documents will be evident.

### 1.    Attachment 1.A

Attachment 1A to the government's motion is a copy of a letter on Custom Financial

letterhead dated September 13, 2003 and addressed to Wagstaff.   It bears her and McMenimen's

apparent signatures.   It summarizes their discussions over the previous weeks about her family,

estate planning, and settlement of ongoing litigation in Florida on the estate of Wagstaff's late

---

1. Sullivan reportedly told investigators that he did not recall signing the document, that he did not know who "B
Lortie" was, that he thought it odd that he would be "cc'd" on a document which he signed, that the printing looked like
his - although he usually used a seal when notarizing a document, and that he likely would not have read the document
if McMenimen just handed it him to notarize.   However, NH RSA 455-A does not require a Justice of the Peace to use
a seal when making acknowledgements.

husband Austin.   It states that Custom Financial will be paid for its services "not more than 25 %

of the total inheritance plus Austin's estate" and that the amount could be adjusted to not less than

15% once the exact payment amount is determined.   McMenimen agrees to defer compensation

for all his work "until the Florida situation is settled" and "to help out [Wagstaff's] personal

situation with regard to taxes, contract bonuses and other contract obligations based on the

investments."

The FBI Questioned Documents Unit observed "limited similarities" between the Wagstaff

signature on the 2003 letter to her known signatures but drew no conclusion on whether she was

the writer "due to the presence of unexplained characteristics and the limited detail and clarity."

However, a lay comparison of the contested signature with Wagstaff's known writings, together

with its content, will suffice to establish its authenticity.

On September 5, 2012 Wagstaff reportedly told investigators that she had never seen the

2003 letter before.   She denied signing it but conceded that it appeared to contain her signature.

Notably, months earlier, in January of 2012, she had initiated a civil suit against McMenimen,

alleging that he had abused his position as her financial adviser to misappropriate $900,000 which

he had not earned.   It would not have furthered those claims to confirm the authenticity of the

2003 letter.

Wagstaff's statements to investigators in 2011and 2012 validate portions of the 2003 letter.

They confirm that for many years McMenimen provided financial and estate planning services to

Wagstaff and family members, that there were probate proceedings in Florida concerning her and

her children's share of her stepmother's estate, that McMenimen accompanied family members

during those proceedings, that he assisted Wagstaff in establishing an irrevocable trust, and that

she and he discussed equalizing disbursements to each of her three children.   Although Wagstaff

denied compensating or agreeing to compensate McMenimen for his services, she said she paid

him bonuses.   She did not recall the exact amounts, but denied paying him $100,000 or more.

### Attachment 1.B

Attachment 1.B to the government's limine motion, dated April 6, 2010, bears the

purported signatures of Wagstaff and McMenimen.   It states *inter alia* that she agreed to pay him

"for services rendered including expenses for consulting and representation with regards to her

parents estate settlement," that the total amount due was $420,000, and that McMenimen, formerly

doing business as Custom Financial and then as PSB, agreed to defer payments through 2010.

The FBI Questioned Documents Unit did not reach a definite conclusion about Wagstaff's

signature on the April 6 agreement, but "similarities were observed to indicate" that she may have

signed it.

Investigators reportedly showed Wagstaff the April 6 agreement on September 11, 2012.

Although she denied signing it, denied that McMenimen told her he did business as PSB, and

denied agreeing to compensate him in any amount, she conceded that her signature appeared to be

authentic.

### Attachment 1.C

Attachment 1.C to the government's limine motion, dated May 25, 2010 and captioned

"Re: Wgstaff Final Payment" bears the apparent signatures of Wagstaff and McMenimen.   It

states that in late 1997 and early 1998 Wagstaff contracted with McMenimen DBA Custom

Financial "to represent and assist in issues surrounding the settlement of her parents estate" and

that "Wagstaff would pay all expenses for the representation and the parties would agree on a later

date on payments."   The document also states. "Over the last 10 years Susan Wagstaff has made periodical payments."   The body describes a final payment of $95,000.   However, handwritten notes include "to be modified in August."

On September 11, 2012 Wagstaff reportedly told investigators that was the first time that she had seen the document, denied signing it, thought the signature looked suspicious, did not recognize the handwriting, denied ever agreeing to compensate McMenimen, and denied owing him any amount.

Again, the FBI Questioned Document Unit did not reach a definite conclusion about Wagstaff's signature on the May 25 document, but "similarities were observed to indicate" that she may have signed it.   Comparison of the signature on the May 25 document with Wagstaff's known signatures on Exhibit A, Exhibit B, and other which she undeniably signed buttress the conclusion that she signed it.

### Attachment 1.D

Attachment 1.D to the governments' limine motion, dated August 14, 2011 bears the apparent signatures of Wagstaff and McMenimen.   It memorializes "the final transaction" between them pursuant to an agreement by Wagstaff on or about September 1, 2000 to pay "a fee for estate services in the amount of 25% of her inheritance plus some expenses."   The fee was to have been fully paid "in 2009 and 2010 but [was] not feasible for tax purposes and poor calculations by Frederick McMenimen."   It states, "This final expected payment of $120,000 due in the next 30 days will fulfill the agreement and no further payments will be made."   Payment was to be made to PSB LLC.

Copies of records provided during discovery indicate that Wagstaff wrote a $120,000

check to PSB on October 19, 2011 and made no further payments thereafter.

The FBI Questioned Documents Unit observed "limited similarities" between the Wagstaff signature on the August 14 document and her known writings but reached no conclusion about whether or not she was signed it, "due to the presence of unexplained characteristics and the limited detail and clarity of the … writing."

Wagstaff conceded to investigators that the signature could be hers.   She again denied that she had seen the agreement before September 5, 2012, that she ever discussed compensation with McMenimen, and that she ever agreed to compensate him for an amount equal to 20% of her inheritance.

### Attachment 1.E

Attachment 1.E to the government's limine motion is dated October 19, 2008, captioned as an agreement between Mekshes and McMenimen, purports to bear their signatures, and states that it is notice of a final payment of $60,000 for his time as her advisor and consultant on financial matters from 1998 through 2008.

The FBI document identification unit reached no definite conclusions as to whether Mekshes signed the October 19 agreement but noted that similarities between her known writings and the signature on that document indicate that she may have signed the agreement.

 Shown the document by investigators on September 13, 2012, Meshes reportedly responded as follows:

> "Mekshes did not remember when she first saw the written agreement dated
> October 19, 2008 between her and FVM 3 [McMenimen]. She did verify that the signature
> on the agreement was her signature.   According to the document in question, Mekshes
> agreed to pay $60,000 to FVM 3 for services he rendered to her from 1998 - 2008 because
> Mekshes was not previously charged fees. The document in question looked familiar to

Mekshes and she must have owed $60,000 to FVM 3 if that was part of their agreement. FVM 3 provided 15 ½ years of work to Mekshes and FVM 3 earned it."

FM_INT-00049

**Attachment 1.F**

Attachment 1.F to the government's limine motion, dated May 19, 2011, states that it is an agreement between McMenimen and Beals which modifies previous documents between them "for agreed compensation for estate planning services from 1997 through 2011," that the "original agreement called for an annual fee of $10,000 for services," that "the parties agreed to defer payments for personal reasons," that in "2010 the parties agreed to payments [being] paid out over two years," and that "after final payments in 2011 no further compensation will be paid out unless a new agreement is made."

The FBI document identification unit could not definitely determine whether Beals signed the May 19 agreement, but noted that observed similarities between it and her known writing indicate that she may have signed it.   According to an FBI report, on September 11, 2012, "Beals acknowledged that the signature on the document was her signature but that she was absolutely sure she never signed the document."   She did not remember ever entering into an agreement to compensate McMenimen for his services.   She confirmed that McMenimen began working as a financial advisor to her and her husband in 1997 and helped her get financial affairs in order after her husband death in 2007.but denied ever discussing compensation for his services.

**C.   The disputed documents should not be excluded on hearsay or other grounds.**

Accompanying the six disputed documents delivered to the United States Attorney's office on September 14, 2012 were two certificates of authenticity of domestic business records pursuant to Federal Rule of Evidence 902(11), copies of which are attached to the government's supporting

memorandum as Exhibits 1.A and 1.B.    McMenimen submits that, as stated in the certificates,

he was the keeper of records for PSB Sports and for Custom Financial respectively, that the

documents produced pursuant to the grand jury subpoenas were made at or near the time of the

occurrence of the matters set forth by, or from information transmitted by, a person with

knowledge of those matters, that the records were kept in the course of regularly conducted

business activity of PSB Sports or Custom Financial, and that such records were made by the

respective entity as a regular practice.   He submits that the six documents are therefore admissible

under Federal Rule of Evidence 803(6), the business records exception to the hearsay rule.

Even if *arguendo* Rule 803(6) does not support admission of the documents, they are

admissible as "verbal acts" not subject to hearsay challenge.

Verbal acts "include statements whose utterance "gives rise to legal consequences," **such

as the words used by contracting parties in reaching an agreement** or by individuals charged

with making a threat, bribe or misrepresentation. The "verbal parts of actions" doctrine establishes

that "utterances that help to clarify or define ambiguous conduct are not hearsay."   5 Jack B.

Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* 801.11[3]-[4], at 801-818-21

(Joseph M. McLaughlin, ed., 2d ed. 2009), quoted in United States v. Diaz, 597 F.3d 56, 65, n.9

(1st Cir.2010) (emphasis added).   See the 1972 Advisory Committee Notes to Fed. Rule Evid.

801(c), which state that the effect of that subdivision "is to exclude from hearsay the entire

category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal

rights of the parties or is a circumstance bearing on conduct affecting their rights."   See also

United States v. Bellucci, 995 F.2d 157, 160-61 (9th Cir. 1993), *Cert. denied*, 512 U.S. 1225

(1994)

No memorandum accompanies this motion because it contains supporting authority.

WHEREFORE, it is respectfully requested that the Court schedule an evidentiary hearing on the government's motion, deny the relief sought therein, and grant such other and further relief as may be just.

Respectfully submitted,

FREDERICK V. MCMENIMEN, III,
By His Attorney,

Date: August 31, 2014                  /s/ Bjorn Lange
                                          Bjorn Lange (NHBA # 1426)
                                          22 Bridge Street
                                          Concord, NH 03301
                                          Tel. 603-226-7360
                                          Bjorn_Lange@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2014 the above document was served via ECF to AUSA William Morse and all other counsel of record, and that a copy will be delivered to the defendant.

/s/ Bjorn Lange
Bjorn Lange

12